**KRESS et al. v. STANTON.**
**KRESS et al. v. GRANGER.**

**Civ. A. Nos. 7089, 7090.**
United States District Court
W. D. Pennsylvania.

June 25, 1951.

Alexander J. Barron, James Milholland and Alter, Wright & Barron, all of Pittsburgh, Pa., for plaintiffs.

Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe, John W. Fisher, Sp. Assts. to Atty. Gen., Edward C. Boyle, U. S. Atty., Pittsburgh, Pa., for defendants.

CLARY, District Judge.

This is an action by the Executors of the Estate of Frederick J. Kress, deceased, to recover income taxes paid to the then Collectors of Internal Revenue for the Twenty-third District of Pennsylvania for the calendar year 1941 in the sum of $27,131.15. Claim for refund having been rejected by the Commissioner of Internal Revenue, these actions were instituted on April 5, 1948.

From pleadings, exhibits and stipulations entered into between the parties, I make the following

### Findings of Fact

1. Frederick J. Kress died a resident of the City of Pittsburgh, Allegheny County, Pennsylvania on October 6, 1939, and his Last Will and Testament, dated February 5, 1935, and Codicil thereto, dated November 4, 1935, were duly probated October 13, 1939 in the Office of the Register of Wills of said County and State and recorded in Will Book Vol. 243, page 560, at No. 4843 of 1939 of the Records of said Office, whereupon the said Register of Wills in said proceeding issued Letters Testamentary on the estate of the said decedent to the plaintiffs, who are now the duly qualified and acting Executors of the said estate.

2. The pertinent provision of the Last Will and Testament of Frederick J. Kress

necessary for a determination of the issue involved in this case is Article Fourth, Section (B) (b) which reads as follows:

"Fourth. I give and bequeath to Fidelity Trust Company, of Pittsburgh, a Pennsylvania corporation having its domicile in the City of Pittsburgh, Allegheny County, Pennsylvania, and to my wife, Lillian Conner Kress, or the survivor of them, all shares of the capital stock of the F. J. Kress Box Company, a Pennsylvania Corporation, (sometimes hereinafter called the 'Company') to me belonging at the date of my death, they to have and to hold the same in trust, for the following uses and purposes:

\*    \*    \*    \*    \*

"(B) \* \* \*.

"(b) The Trustees shall hold the balance of my said shares of capital stock of the Company, in trust, for the following purposes:

"During the period not exceeding ten (10) years from the date of my decease and so long as J. Burk LeClere shall continue to be actively employed by the Company as an Executive Officer thereof, if in any fiscal year of the Company commencing with January first of the fiscal year in which I shall die, the net earnings of the Company computed as set forth in Paragraph (B) (a) of this Article shall be equal to or in excess of six (6%) per cent. of the par value of the capital stock of the Company then issued and outstanding, the said J. Burk LeClere shall have the privilege, provided the Trustees be of the opinion that his ability and effort have been one of the contributing causes for such earnings, and subject to the further conditions and limitations hereinafter set forth, of purchasing from the Trustees in the year immediately succeeding the year in which the said earnings shall have been realized such number of said shares of the capital stock of the Company, at book value, as he may elect to purchase, provided that the total number of shares which the said J. Burk LeClere may purchase during the said period of ten (10) years shall not exceed twenty-five (25%) per cent. of the total capital stock of the Company issued and outstanding.

"When and if at the expiration of the said period of ten (10) years from my decease the said J. Burk LeClere shall have purchased from the Trustees shares equal in amount to twenty-five (25%) per cent. of the then outstanding capital stock of the Company, the Trustees shall hold the balance of the shares of the capital stock for a further period not exceeding two (2) years from said date when the total of the purchases so made by the said J. Burk LeClere shall have equalled the said twenty-five (25%) per cent. of the then outstanding capital stock of the Company and at any time during said period of two years the said J. Burk LeClere, if at said time he shall be actively identified with the Company as aforesaid, shall have the privilege, subject to the limitations thereon and conditions hereinafter set forth, of purchasing all, but not less than all, of the shares of capital stock of the Company then held in trust, whether under the provisions of subdivision (B) (a) or of subdivision (B) (b) of this Article, at the book value of the said shares.

"If the said J. Burk LeClere shall sever his connection with the Company at any time during the said period of ten (10) years from the date of my decease, upon the severance of the said connection, his privilege of purchasing the said shares of stock shall automatically cease.

"The Trustees are hereby authorized and empowered to agree with the said J. Burk LeClere upon such terms of payment for the said shares which he may purchase as aforesaid as the Trustees, in their discretion, may deem proper, and to accept the said shares of stock as collateral security for the payment of any note which they may see fit to accept on account of the purchase price for said shares.

"In arriving at the amount to be paid for any of the said stock during the term of the trust, the price therefor shall be its book value as of the first day of January immediately preceding the date of the purchase of the said shares, if the said shares shall be purchased within the first six months of any calendar year, and the book value thereof as of the first day of July immedi-

ately preceding the date of the purchase of the said shares, if the said purchase shall be made during the last six months of any calendar year. In arriving at the said book value, no allowance shall be made for good will and patent rights, licenses or privileges, unless the same shall have appeared on the books of the said Company as an asset during the year preceding that in which any of the said shares may be purchased.

"The privileges hereinbefore granted to the said J. Burk LeClere of purchasing the said shares of stock held in trust as aforesaid are granted, subject to the further limitation and condition that the Trustees may, in their discretion, revoke the same at any time, if the Trustees shall be able to effect a sale, on terms which they may deem advantageous, of all of said shares of stock or in the event of a sale of the property and assets of the Company, including its good will, or in the event of the merger or consolidation of the Company with any other corporation or corporations, and the Trustees, anything hereinbefore contained to the contrary notwithstanding, shall not be prevented nor hindered from voting any of the shares in the trust in favor of such sale, merger or consolidation, or from collecting or receiving the proceeds, profits and emoluments thereof, as freely as though said privilege had not been granted, and the Trustees are hereby expressly authorized and empowered to effect a sale of all of said shares of stock, or to vote in favor of any sale of the assets of the Company, or in favor of a merger or consolidation of the Company with any other corporation or corporations whenever, in their uncontrolled discretion they may deem it advantageous so to do."

3. Walter L. Miller, deceased, was at the material times hereinafter set forth Collector of Internal Revenue for the Twenty-third District of Pennsylvania.

4. On or about March 15, 1942 the plaintiffs filed an Income Tax Return for the calendar year 1941 with the said Walter L. Miller, Collector of Internal Revenue, and paid to him, as such Collector, the tax shown on said Return to be due, to wit, the sum of $17,339.49.

5. On July 30, 1943 the Commissioner of Internal Revenue issued to the plaintiffs his ninety day letter, wherein he determined the tax liability of the plaintiffs for the year 1941 to be the sum of $27,131.15, and a deficiency assessment against the plaintiffs for the said year in the sum of $9,791.66.

6. On December 2, 1943 the plaintiffs paid to Stanley Granger, the Collector of Internal Revenue for the Twenty-third District of Pennsylvania then in office, and who still holds said office, the said sum of $9,791.66, the amount of the deficiency in the income tax which was assessed against the plaintiffs for the year 1941.

7. On March 14, 1945 the plaintiffs filed with the said Collector of Internal Revenue for the Twenty-third District of Pennsylvania a claim for a refund of the tax paid by the plaintiffs for the year 1941 in the amount of $27,131.15. The basis of the claim was that the taxpayer was entitled to deduct as a loss for the year 1941 the amount representing the difference between the amount realized from the sale of 1452 shares of the capital stock of the F. J. Kress Box Company and the amount as fixed by the Bureau of Internal Revenue for Inheritance Tax purposes which allowance, if made, would result in no tax being due the United States.

8. On April 9, 1946 the Commissioner of Internal Revenue notified the plaintiffs, by registered mail, that the said claim for refund had been disallowed in its entirety.

9. Frederick J. Kress at and prior to the date of his death was President of F. J. Kress Box Company, a Pennsylvania corporation, with its principal office in Pittsburgh, Pennsylvania. The total number of shares of the capital stock of the said Company issued and outstanding at the date of the death of Frederick J. Kress was 6,410 shares, which were owned as follows: 4,694 shares were owned by the decedent; 1,000 shares were held by the decedent and Fidelity Trust Company, as Trustee under a Deed of Trust, dated August 13, 1935, created by the decedent for the benefit of members of his family; 500 shares were owned by Lillian Conner Kress, the decedent's wife; 136 shares were owned by J.

Burk LeClere, then Vice-President of F. J. Kress Box Company; and 80 shares were owned by other officers and employees of the said Company.

10. Following the death of Frederick J. Kress, J. Burk LeClere succeeded him as President and Chief Executive Officer of the F. J. Kress Box Company, and was actively employed in that capacity by F. J. Kress Box Company throughout the fiscal year of the Company commencing January 1, 1940 and has been so employed to the present time.

11. The said 4,694 shares of the capital stock of the F. J. Kress Box Company owned by the decedent at the date of his death were appraised on or about August 26, 1942 by the Bureau of Internal Revenue for Estate Tax purposes at $356.00 a share.

12. The net earnings of F. J. Kress Box Company for its fiscal year commencing January 1, 1940, after proper deductions and allowances had been made for depreciation and obsolescence, in accordance with approved accounting practice, and which were available for dividends, were largely in excess of 6% of the par value of its capital stock then issued and outstanding.

13. The plaintiffs were on the several dates set fourth in paragraphs 14, 15 and 16 of the opinion that J. Burk LeClere's ability and effort had been one of the contributing causes for the said earnings of the F. J. Kress Box Company during its fiscal year commencing January 1, 1940.

14. On May 28, 1941 the said J. Burk LeClere notified the plaintiffs by letter that he desired to purchase immediately 150 shares of the capital stock of the F. J. Kress Box Company. On June 3, 1941 the plaintiffs sold to the said J. Burk LeClere the said 150 shares of stock at $220.93 per share, which was the book value of the said stock on the 1st day of January, 1941. The total amount realized from the sale of the said shares of stock was $33,139.50.

15. On December 15, 1941 the said J. Burk LeClere notified the plaintiffs by letter that he desired to purchase immediately 250 shares of the capital stock of the F. J. Kress Box Company. On December 19, 1941 the plaintiffs sold to the said J. Burk LeClere the said 250 shares of stock at $228.54 per share, which was the book value of the said stock on the 1st day of July, 1941. The total amount realized from the sale of the said shares of stock was $57,135.00.

16. On December 22, 1941 the said J. Burk LeClere notified the plaintiffs by letter that he desired to purchase immediately 1,052 shares of the capital stock of the F. J. Kress Box Company. On December 23, 1941 the plaintiffs sold to the said J. Burk LeClere the said 1,052 shares of stock at $228.54 per share, which was the book value of the said stock on the 1st day of July, 1941. The total amount realized from the sale of the said shares of stock was $240,424.08.

17. The fair market value of 1,452 shares of capital stock of F. J. Kress Box Company on October 6, 1939 was $516,912.00. The total amount received by the estate of Frederick J. Kress, dec'd., from the sale of the said shares of stock to the said J. Burk LeClere in the year 1941 was $330,698.58.

18. Testator Frederick J. Kress by Article Fourth, Section (B) (b) of his Will made an offer, binding upon his trustees, to J. Burk LeClere by the terms of which J. Burk LeClere in consideration of his continued services in an executive capacity with the F. J. Kress Box Company and his contribution to the successful operation upon certain conditions stated would within a period of twelve years be able to purchase all the stock of the company owned by the estate.

19. J. Burk LeClere performed all of the conditions precedent to the exercise of his right to purchase by continuing his successful operation of the company and accepted the offer contained in the testator's will by the performance of said services and by purchasing the 1,452 shares of stock above referred to at stated periods in 1941, as indicated in Findings of Fact Nos. 14, 15, 16 and 17.

20. The offer originating in the Will of the Testator Frederick J. Kress was not a gift nor was it a bequest but was a bargain for continued services by J. Burk LeClere

to the box company for the benefit of decedent's estate in sustaining the value of his estate and insuring income to it.

21. The transaction here involved was a transaction entered into for profit.

## Discussion

In order to maintain their position, plaintiffs have the burden of establishing that their claimed loss comes within the scope of allowable losses permitted by the Internal Revenue Code. The specific section under which the loss is claimed, Section 23(e)(2) of the Internal Revenue Code, 26 U.S.C.A., reads as follows:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

\*　　\*　　\*　　\*　　\*

"(e) Losses by individuals. In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

\*　　\*　　\*　　\*　　\*

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; \* \* \*"

The simple question to be determined in this case is whether the estate, from a sale of stock at book value under the provisions of the decedent's will, sustained a loss deductible by it in the calendar year in which the stock was sold, to the extent that the book value at the time of sale was less than the market value at the time of decedent's death. For the purpose of clarity, the latter value will be hereafter referred to as cost basis to the estate.

There are no facts in this record which determine the market value of the stock at the time of the sales to LeClere. However, since market value at the time of sale is of importance only as bearing upon whether the estate received the highest and best price obtainable, and since both parties have assumed that book value at the date of sale was less than market value at that time, I will do likewise. We do know, through stipulated facts, the book value at the times of sale, $220.93 and $228.54, and the market value at the time of death, $356.00 per share, the figure at which the shares were assessed for estate tax purposes by the Commissioner of Internal Revenue.

The defendants in support of their position advance three arguments. First, that the difference between book value and cost basis represented a bequest by the decedent to LeClere and is not a deductible loss. Second, that this was not a transaction entered into for profit and, finally, that if the difference between book value and cost basis was not a bequest by the decedent to LeClere, it should be regarded as a capital contribution by the decedent to the corporation and not deductible in the taxable year.

The plaintiffs, on the other hand, strongly contend that the sale of the stock at book value was an actual loss to the estate in dollars to the extent of the difference between the price obtained and the cost basis, and further, that this loss was incurred in a transaction entered into for profit.

In their brief and at oral argument, the defendants argue that it was impossible to view this as a transaction entered into for profit since the decedent by ordering that the shares be sold at book value precluded a sale at the highest and best price obtainable which could reasonably be expected to be higher than book value. The shares in question in the transactions involved in this case represent roughly 30% of the holdings of the estate of the stock of the box company. The estate, after the sale of the stock to LeClere, still remained the majority stockholder and in control of the box company. It does not strike me as odd that a portion of the holdings should be sold at a loss in order to obtain an overall profit or financial advantage for the estate with respect to its remaining holdings. Whether the highest and best price obtainable for the shares of stock involved was actually secured by the estate in the sale to LeClere cannot be determined without due consideration of the value of the services rendered by LeClere and the effect of those services on the holdings of the estate. It is true that the estate suffered a loss in dollars in respect of the sale of the 1,452 shares of stock. Nevertheless, it was a transaction entered into for profit in that the agreement to transfer the stock at book value was conditioned upon the continued

performance by LeClere of certain services sought by the decedent as the means of insuring income for the estate and supporting and enhancing the value of the remaining stock retained by it.

The transaction viewed in both a practical and legal light indicates no intent on the part of the decedent to make a gift, as the defendants contend. Rather, it has all the indicia of a cold business proposition. I have examined the will carefully and can find in the clause involved no indication of any donative intent. The box company was apparently completely controlled and dominated by the decedent in his lifetime through stock ownership and his position as president. There is no doubt in my mind that the decedent was apprehensive concerning the continued success of the company after his death and the effect of a possible failure of the company on the value of his estate and its ability to produce income. The decedent indicated clearly in his will that he regarded the continued success of the company as dependent upon LeClere. In order to protect the value of the holdings of his estate and to insure income to it, the decedent made an attractive offer, through his will, binding upon his trustees, to an employee of the company. The purpose of this offer was to insure the continued services of that employee to the company for the financial advantage and profit of the decedent's estate. Under the terms of the offer as contained in the will, the employee was given the opportunity to purchase 25% of the shares of stock of the company at what developed to be at the time of sale considerably less than the price at which they were charged to the estate. It might be noted that this was not inevitable. It is quite conceivable that the book value of the shares might have reached or exceeded $356.00 a share before LeClere decided to exercise his option to purchase. This option could only be exercised if the key employee continued to render services to the company in an executive capacity and be responsible in the judgment of the trustees for producing certain stated percentages of profits. He was further given an opportunity after a period of twelve years continued service to purchase the entire holdings of the estate in the company under conditions outlined in the will.

The offer, which LeClere was at liberty to accept or reject, was one reasonably calculated to induce him to remain with the company. There is nothing in the record to substantiate a finding of any intent on the part of the decedent to make a gift, either outright or on condition. The decedent was bargaining for and, in fact, procured for his estate a very valuable quid pro quo, continuation of the services of LeClere to the company and certainty of income to the estate. That this was done for the benefit of the estate admits of no doubt. The benefit was reflected in dividends to the estate and increased value of the stock owned by it.

Almost precisely the same situation confronted the Court of Appeals for the Second Circuit in the case of Scherman v. Helvering, 1935, 74 F.2d 742. The only distinctions between the Scherman case and the instant case are that in the Scherman case there was an agreement between living persons and the services bargained for were to be rendered in the future, whereas, in the instant case there is a unilateral offer contained in a will which could only be accepted by performance and for the benefit of an estate. In the Scherman case, the taxpayer deducted as a loss from his gross income the difference between the cost of shares of stock to him and the price at which he sold them to a key employee. He paid a tax calculated on the balance but the Commissioner disallowed the deduction. The question before the Court was whether this was a deductible loss. Judge Learned Hand in his opinion held that a loss was proven despite the fact that the shares were sold by the taxpayer to the key employee at less than their market value at the time of the sale. In the course of his discussion he discounted the argument that the services to be rendered in the future and dividends to be earned in the future were present property (other than money) received in the sale. From that it might be argued that a different situation obtains in the instant case, in that here part of the services had already been rendered and some dividends had been paid at the

time of the sale. To attempt to place a value upon LeClere's continued association with the company up to the time of the sale and prospectively into the future would, in my opinion, be impractical and entirely within the realm of speculation. A simpler and more logical approach is to permit the estate to deduct the difference between the amount realized in cash and the price at which it was charged to the estate as a loss, to regard the dividends as income and to deal with the increase, if any, in the value of the remaining holdings as a profit at the time of the disposition of those shares. Normal accounting processes require that the loss be shown by the trustees in their estate account. The final paragraph of the opinion of Judge Learned Hand, 74 F.2d at page 743, is particularly pertinent at this point: "This last consideration also shows the injustice of disallowing the loss at the present time; it is now or never. If Wood's accession did turn out to be as profitable as Scherman and Haas expected, there would be larger dividends if the shares were kept, and a higher sale price if they were sold. But the shareholders could not set off this loss—for there surely was a loss de facto—against either of these. There would be no injustice in this if Scherman had given Wood the shares because a gift is not 'entered into for profit'; but this was a business venture, in which if Scherman is to be charged with the profits —as he will be—he ought to be allowed to deduct what they have cost him."

In order for LeClere to earn the right to purchase the shares at the book value, he had to be responsible for producing certain percentages of profits for the corporation which in the normal course of business would result in dividends for the stockholders, in this case the estate. In that respect the estate will be charged with the profits and therefore ought to be allowed to deduct what those profits have cost it.

The final contention of the defendants is that the difference in value involved was a capital contribution by the decedent to the corporation. The corporation, as such, does not enter into this transaction. We are not here concerned with the services as such. Rather, we are concerned with the results of the services, dividends to the estate and enhancement in the value of the remaining stock held by it. As I have stated before, the transaction was entered into solely for the benefit of the estate and for profit. The corporation was merely the conduit or agency through which LeClere's services would be translated into income and profit for the estate. So far as the corporation was concerned in its relations with LeClere, so long as LeClere was an employee of the corporation he was bound to give it his best services. So far as the estate was concerned, it sought to insure his continued association with the corporation. Viewing it in that light, I cannot agree with the contention of the defendants that LeClere's services constituted a capital contribution to the corporation by the decedent.

In support of their contention that this transaction involved a gift or bequest, defendants have cited several cases, among which was Evans v. Rothensies, 3 Cir., 1940, 114 F.2d 958. Clearly, under the facts of that case, the transaction involved a gift. It was a family transaction which did not, as in the instant case, involve substantial and very valuable services. Under proper facts I would have no hesitancy in applying the doctrine of the Evans case, but it is clearly distinguishable from the case at bar and not applicable under the facts before me. As I have indicated above in my discussion concerning the question whether this was a "transaction entered into for profit", there is no evidence to support any finding of donative intent.

Having found that this was a transaction entered into for profit, and not a gift or bequest, the loss in dollars from the sale of the shares is a deductible loss under the provisions of the Internal Revenue Code. Therefore, I make the following

### Conclusions of Law

1. That the sale by the estate of Frederick J. Kress of 1452 shares of stock of the F. J. Kress Box Company during the taxable year of 1941 was a transaction entered into for profit.

2. That the value or cost basis of the shares to the estate was $516,912.00; that the total amount received by the estate of

Frederick J. Kress, deceased, from the sale of the said 1452 shares of stock in the year 1941, $330,698.52, represented a loss to the estate of $186,213.48, sustained in a transaction entered into for profit under Section 23(e) (2) of the Internal Revenue Code.

3. That the deductible loss of $186,213.48 resulted in no tax being due the United States for the taxable year of 1941.

4. That plaintiffs are entitled to separate judgments against defendants in the total sum of $27,131.15, with interest.

Appropriate orders will be entered.